[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 11, 2001
THOMAS K. KAHN
CLERK

_____

No. 98-2709

_____

D. C. Docket No. 98-00460-CIV-J-10C

EMILY ADLER, individually; on behalf
of herself and all persons similarly situated,
SETH FINCK, individually; on behalf of
himself and all persons similarly situated, et al.,

Plaintiffs-Appellants,

versus

DUVAL COUNTY SCHOOL BOARD,
DUVAL COUNTY PUBLIC SCHOOL DISTRICT,

Defendants-Appellees.

_____

No. 98-2720

_____

D.C. Docket No. 98-00460-CIV-J-10C

EMILY ADLER, individually; on behalf
of herself and all persons similarly situated,
SETH FINCK, individually; on behalf of
himself and all persons similarly situated, et al.,

Plaintiffs-Appellees,

versus

SUSAN BOLES, as parent & next friend of
Rebecca Boles, a minor child and on behalf
of all public school students within the Duval
County Public School District,

                                        Movants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____
**(May 11, 2001)**

Before ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, BIRCH, DUBINA, CARNES, BARKETT, HULL, MARCUS, WILSON, KRAVITCH and COX*, Circuit Judges.**

MARCUS, Circuit Judge:

On March 15, 2000, this Court ruled that Duval County's facially-neutral policy permitting high school seniors to vote upon the delivery by a student of a message entirely of that student's choosing as part of graduation ceremonies did not violate the Establishment Clause. Adler v. Duval County Sch. Bd., 206 F.3d 1070 (11th Cir.) (en banc), pet. for cert. granted and judgment vacated, 121 S. Ct.

---

*Circuit Judges Kravitch and Cox elected to participate in this decision, pursuant to 28 U.S.C. § 46(c).

**Circuit Judge Susan H. Black did not participate in this decision.

2

31 (2000). Plaintiffs thereafter petitioned the Supreme Court for certiorari. Meanwhile, on June 19, 2000, the Supreme Court rendered its decision in Santa Fe Independent School District v. Doe, 530 U.S. 290, 120 S. Ct. 2266 (2000), which invalidated a Texas school board's policy permitting students to vote upon the delivery of a "statement or invocation," subject to officials' approval, at each home high school football game. On October 2, 2000, the Court vacated our decision and remanded it for further consideration in light of Santa Fe. The case was returned to us on December 19, 2000, and we proceeded to rehear the case en banc.

Having carefully reviewed the Supreme Court's opinion, and considered supplemental briefs from the parties and amici, we conclude that Santa Fe does not alter our previous en banc decision, and accordingly we reinstate that decision and the judgment in favor of Duval County. Nevertheless, we take this opportunity to explain why we believe that Santa Fe does not alter the outcome of this case. Simply put, after (as before) Santa Fe, it is impossible to say that the Duval County policy on its face violates the Establishment Clause without effectively banning all religious speech at school graduations, no matter how private the message or how divorced the content of the message may be from any state review, let alone censorship. Santa Fe does not go that far, and we are not prepared to take such a step.

I.

At the outset, it is helpful to summarize briefly the facts and analysis of our prior en banc opinion. The Duval County policy provides in relevant part:

> "1. The use of a brief opening and/or closing message, not to exceed two minutes, at high school graduation exercises shall rest within the discretion of the graduating senior class;
>
> 2. The opening and/or closing message shall be given by a student volunteer, in the graduating senior class, chosen by the graduating senior class as a whole;
>
> 3. If the graduating senior class chooses to use an opening and/or closing message, the content of that message shall be prepared by the student volunteer and shall not be monitored or otherwise reviewed by Duval County School Board, its officers or employees;
>
> The purpose of these guidelines is to allow students to direct their own graduation message <u>without monitoring or review by school officials</u>."

206 F.3d at 1072 (emphasis added). We defined the issue then before us as "whether the Duval County school system's policy of permitting a graduating student, elected by her class, to deliver an unrestricted message of her choice at the beginning and/or closing of graduation ceremonies is facially violative of the Establishment Clause." <u>Id.</u> at 1073. Analyzing this policy under the Supreme Court's opinions in <u>Lee v. Weisman</u>, 505 U.S. 577 (1992) and <u>Lemon v.</u>

4

Kurtzman, 403 U.S. 602 (1971), we concluded that the policy did not violate the

Establishment Clause on its face.[1]

Although we offered multiple reasons for that decision, our Lee analysis

turned on several key facts. First, we emphasized that under Duval County's

policy school officials have no power to direct that a message (let alone a religious

message) be delivered at graduation ceremonies, or control in any way the content

of any message actually to be delivered. As we explained:

> [U]nder the Duval County graduation policy . . . neither the
> School Board nor its principals may ordain, direct, establish, or
> endorse a religious prayer or message of any kind. Indeed, by the
> very terms of the policy, a religious message may not even be offered
> at graduation. The Duval County policy explicitly divorces school
> officials from the decision-making process as to whether any message
> -- be it religious or not -- may be delivered at graduation at all.
> Moreover, decisional control over the most crucial elements of the
> graduation policy rests with the students and not the state. . . . Under
> the policy, the School Board and its agents have no control over who
> will draft the message (if there be any message at all) or what its
> content may be. The School Board also does not suggest in any way,
> let alone require, that the graduating class consider religious or any
> other criteria in deciding whether to have a student message or in
> selecting a particular student speaker. And most notably, if the
> graduating class chooses to have a message, the content of the
> message shall be prepared by the student speaker alone and no one
> else. The Duval County School Board is expressly prohibited by the

---

[1]We expressly declined to consider at that time any as-applied objection to the policy's constitutionality. 206 F.3d at 1073 n.4 ("We do not address any potential 'as-applied' claims raised below by Appellants."). Accordingly, we did not consider Appellants' objections regarding the policy's alleged application after 1993. Nothing in Santa Fe in any way affects that decision or supports consideration of Appellants' as-applied challenges now.

very terms of its policy from influencing or editing the message in any way. [The] decision [as to content] rests solely with the elected student speaker -- with neither the senior class nor the school exercising any sort of editorial oversight. Therefore, on the face of the policy itself, the students unambiguously understand that any student message is utterly divorced from any state sponsorship.

206 F.3d at 1076.

Second, we rejected the argument that the state's role in providing a vehicle for a graduation message by itself transformed the student's private speech into state-sponsored speech. We accepted the assumption that the school board "exerted overwhelming control over the graduation ceremony," but stressed that the board "did not have control over the elements which are most crucial in the Establishment Clause calculus: the selection of the messenger, the content of the message, or most basically, the decision whether or not there would be a message in the first place." Id. at 1080.

We likewise rejected the argument that Duval County's policy would have the impermissible effect of coercing unwilling listeners to participate in a state-sponsored religious exercise. As we explained:

[N]either the Duval County schools nor the graduating senior classes even decide if a religious prayer or message will be delivered, let alone "require" or "coerce" the student audience to participate in any privately-crafted message. While schools may make private religious speech their own by endorsing it, schools do not endorse all speech that they do not censor. We cannot assume . . . that Duval County seniors will interpret the school's failure to censor a private

6

> student message for religious content as an endorsement of that message -- particularly where the students are expressly informed as part of the election process that they may select a speaker who alone will craft any message. . . . No religious result is preordained.

Id. at 1084.

Citing these and other facts, we found as well that the policy met all three prongs of the Lemon test. We concluded that the policy had a secular purpose, including "affording graduating students an opportunity to direct their own graduation ceremony," and "permitting student freedom of expression." Id. at 1085. We also noted that the text of the policy did not reveal a religious purpose, and that the limited pieces of background evidence highlighted for the contention that the policy's secular purpose was a sham could not "strip the policy of [its] secular purpose. No matter what an individual board member may have hoped -- and they said nothing on the record about codifying this policy -- Duval County's policy is facially neutral and undeniably evinces a secular purpose." Id. at 1089. We closed our prior en banc opinion by defining our holding narrowly, stating that Duval County's policy of "permitting graduating students to decide through a vote whether to have an unrestricted student graduation message at the beginning and/or closing of graduation ceremonies does not facially violate the Establishment Clause." Id. at 1091 (emphasis added).

## II.

7

Three months after we issued our prior en banc opinion, the Supreme Court decided <u>Santa Fe</u>. By a 6-3 vote, the Court found that a school district policy permitting students to vote upon the delivery by a student of a "statement or invocation" prior to high school football games violated the Establishment Clause. Because the facts of <u>Santa Fe</u> are fundamentally different in many crucial respects from the facts of this case, they are worth presenting in some detail.

For a period of time leading up to and including the 1992-93 and 1993-94 school years, the Santa Fe school district allowed students to read overtly Christian prayers from the stage at graduation ceremonies and over the public address system at home football games. The prayers were characterized as "invocations" or "benedictions" for these events, and typically were given by officers of the student council. Similar prayers were recited by the student council "chaplain" prior to the start of football games.

In 1994, responding to the Supreme Court's decision in <u>Lee</u>, the district drafted a written policy that prohibited clerics from delivering invocations or benedictions at graduation ceremonies, but otherwise did not prohibit prayer at school functions. After graduation ceremonies that year, the district amended its written policy to say that a school "may permit the graduating senior class(es), with the advice and counsel of the senior class sponsor, to elect to choose student

8

volunteers to deliver nonsectarian, non-proselytizing invocations and benedictions for the purpose of solemnizing their graduation ceremonies." The same policy was adopted for football games.

In April 1995, several students and parents filed suit in federal court, in part to prevent the district from violating the Establishment Clause at imminent graduation exercises. In their complaint the plaintiffs alleged that the district engaged in other proselytizing practices, such as promoting attendance at a Baptist revival meeting, encouraging membership in religious clubs, chastising children who held minority religious beliefs, and distributing Gideon Bibles on school premises. Santa Fe, 120 S. Ct. at 2271-72.

In response to a court order, Santa Fe again revised its policies dealing with prayer at school functions. Policies enacted in May and July 1995 for graduation ceremonies provided the format for the District's August 1995 policy regarding high school football games. That August policy authorized two student elections, the first to determine whether an "invocation" should be delivered, and the second to select the spokesperson to deliver it. On August 31, 1995, according to the parties' stipulation, "the district's high school students voted to determine whether a student would deliver prayer at varsity football games . . . . The students chose to allow a student to say a prayer at football games." A week later, in a separate

election, they selected a student "'to deliver the prayer at varsity football games.'" Id. at 2273 (emphasis added).

Subsequently, in October 1995, the school district slightly modified the August policy. The October version of the policy was (in the Supreme Court's words) "essentially the same as the August policy, though it omits the word 'prayer' from its title, and refers to 'messages' and 'statements' as well as 'invocations.'" Id. The October policy provided in relevant part:

> The board has chosen to permit students to deliver a brief invocation and/or message to be delivered during the pre-game ceremonies of home varsity football games to solemnize the event, to promote good sportsmanship and student safety, and to establish the appropriate environment for the competition.
>
> Upon advice and direction of the high school principal, each spring, the high school student council shall conduct an election, by the high school student body, by secret ballot, to determine whether such a statement or invocation will be a part of the pre-game ceremonies and if so, shall elect a student, from a list of student volunteers, to deliver the statement or invocation. The student volunteer who is selected by his or her classmates may decide what message and/or invocation to deliver, consistent with the goals and purposes of this policy.

120 S. Ct. at 2273 n.6.

After the Fifth Circuit held that both the August and October policies violated the Establishment Clause, the Supreme Court granted the District's petition for certiorari, limited to the following question: "Whether petitioner's

10

policy permitting student-led, student-initiated <u>prayer</u> at football games violates the Establishment Clause." <u>Id.</u> at 2275 (emphasis added). The Court did not propose to address, and did not address in its ensuing opinion, the district's graduation policies.

A majority of the Court found that the October policy violated the Establishment Clause. The Court analyzed the policy under the principle of <u>Lee</u> that "'government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion . . . .'" 120 S. Ct. at 2275 (quoting <u>Lee</u>, 505 U.S. at 587). Initially, the Court determined that messages delivered by students pursuant to the policy would constitute state-sponsored speech rather than private speech. The Court offered essentially four reasons for that finding: (1) the student's speech would be authorized by a government policy that explicitly and implicitly encouraged one particular kind of message, <u>see</u> 120 S. Ct. at 2275, 2279; (2) it would take place on school property at a school event, <u>see id.</u> at 2275, 2278; (3) the government had broad power to regulate the content of the student's speech, <u>see id.</u> at 2276-77; and (4) the electoral system would yield only a single speaker and would completely prevent dissenting viewpoints from being heard, <u>see id.</u> at 2276-77.

Having found that student speech under the policy was, and would be perceived as, state-sponsored, the Court then found that the religious content of the "statement or invocation" permitted by the Santa Fe policy was impermissibly coercive. The Court explained that "[t]he electoral mechanism, when considered in light of the history in which the policy in question evolved, reflects a device the District put in place that determines whether religious messages will be delivered at home football games." Id. at 2280. The Court also reasoned that, even though the case was brought as a facial challenge, it was appropriate as part of the facial inquiry to consider the purpose of the policy. Id. at 2282 (citing Lemon). The Court stressed that "the text of the October policy alone reveals that it has an unconstitutional purpose," and added that the events leading up to the enactment of the October policy further conveyed the school board's purpose to ensure a place for prayer in school functions. Id. For these reasons, the Court concluded that the Santa Fe's football game policy was unconstitutional.

III.

In Santa Fe itself the Supreme Court reiterated just how case-specific Establishment Clause analysis must be under its precedent. As the Court explained:

> Whether a government activity violates the Establishment Clause is "in large part a legal question to be answered on the basis of judicial

12

interpretation of social facts . . . . Every government practice must be judged in its unique circumstances . . . ."

120 S. Ct. at 2282 (citation omitted). We spoke similarly in our prior en banc opinion:

> Establishment Clause jurisprudence calls for the difficult task of separating a student's private message, which may be religious in character, from a state-sponsored religious message, protecting the former and prohibiting the latter. This determination is of "necessity one of line-drawing," see Lee, 505 U.S. at 598, "sometimes quite fine, based on the particular facts of each case," Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 847 (1995) (O'Connor, J., concurring). Indeed, our courts have recognized that "at graduation time and throughout the course of the education process, there will be instances when religious values, religious practices, and religious persons will have some interaction with the public schools and their students." See Lee, 505 U.S. at 598-99.

206 F.3d at 1074 (citations omitted).

The Court in Santa Fe did not attempt to sweep with a broad brush; rather, it found based on the facts then before it that Santa Fe's policy allowing students to elect a speaker to give a "statement or invocation" of plainly religious bent, at every single home football game, subject to content review by school officials and potential state censorship of non- or anti-religious messages, violated the Establishment Clause. The facts of this case are fundamentally different, and in our view require exactly the same result today as they did at the time of our prior opinion.

13

A.

Critical to the Supreme Court's conclusion was its finding that the speech delivered by students pursuant to the Santa Fe policy was state-sponsored rather than private. In reaching that conclusion, the Court relied in substantial part on two facts: (1) the speech was "subject to particular regulations that confine the content and topic of the student's message," Santa Fe, 120 S. Ct. at 2276; and (2) the policy, "by its terms, invites and encourages religious messages," id. at 2277 (emphasis added). Those two dispositive facts are not present here, and that makes all the difference.

First, the Duval County policy does not contain any restriction on the identity of the student speaker or the content of the message that might be delivered. Indeed, school officials are affirmatively forbidden from reviewing the content of the message, and are expressly denied the opportunity to censor any non-religious or otherwise disfavored views:

> "If the graduating senior class chooses to use an opening and/or closing message, the content of that message shall be prepared by the student volunteer and shall not be monitored or otherwise reviewed by Duval County School Board, its officers or employees. [] The purpose of these guidelines is to allow students to direct their own graduation message without monitoring or review by school officials."

206 F.3d at 1072 (quoting policy) (emphasis added). This is in sharp contrast to the Sante Fe policy, under which any message was subject to content regulation by the state. The Santa Fe policy dictated that the process of selecting a speaker and delivering the message was subject to the "'advice and direction of the high school principal.'" 120 S. Ct. at 2273 n.6. As part of that process, school officials were effectively authorized to review the message itself to ensure that it was "'consistent with the goals and purpose of th[e] policy.'" Id. The policy therefore created virtually no check on school officials' power to regulate the proposed student message, giving almost unfettered discretion to state officials acting under the guise of determining that the message would be "'appropriate.'" Id.

The ability to regulate the content of speech is a hallmark of state involvement, and the Supreme Court returned repeatedly to that theme in Santa Fe. The Court highlighted that "[t]he statement or invocation . . . is subject to particular regulations that confine the content and topic of the student's message." Id. at 2276. The Court observed that "Santa Fe's student election system ensures that only those messages deemed 'appropriate' under the District's policy may be delivered." Id.; see also id. at 2279. And the Court expressly characterized the Santa Fe policy as "not a content-neutral regulation" because of its "content restrictions." Id. at 2282; see also id. at 2277 (emphasizing that "the policy

15

mandates that the 'statement or invocation' be 'consistent with the goals and purposes of this policy'" and that accordingly "the District has failed to divorce itself from the religious content of the invocations").  The ability of the state to regulate the content of the students' message was a critical factor in the Court's reasoning, and is indisputably <u>not</u> present in this case.  Under the Duval County policy, if the senior class elects to have a message, the student elected to give that message is totally free and autonomous to say whatever he or she desires, without review or censorship by agents of the state or, for that matter, the student body.  No reasonable person attending a graduation could view that wholly unregulated message as one imposed by the state.

Second, unlike Santa Fe's policy, the Duval County policy does not "by its terms, invite[] and encourage[] religious messages."  120 S. Ct. at 2277.  On the contrary, the policy is entirely neutral regarding whether a message is to be given, and if a message is to be given, the content of that message.  Although the Supreme Court did not limit its analysis to the text of the Santa Fe policy, it placed heavy emphasis on the text's express and unambiguous preference for the delivery of religious messages.

> The policy itself states that the purpose of the message is "to solemnize the event."  A religious message is the most obvious method of solemnizing an event.  Moreover, the requirements that the message "promote good citizenship" and "establish the appropriate

16

> environment for competition" further narrow the types of message deemed appropriate, suggesting that a solemn, yet nonreligious, message, such as commentary on United States foreign policy, would be prohibited. Indeed, the only type of message that is expressly endorsed in the text is an "invocation" -- a term that primarily describes an appeal for divine assistance. In fact, as used in the past at Santa Fe High School, an "invocation" has always entailed a focused religious message. Thus, the expressed purposes of the policy encourage the selection of a religious message.

Id. The fact that the text of the Santa Fe policy expressed a clear preference for religious messages was a key factor in the Court's determination that student speech delivered pursuant to that policy would be viewed as state-sponsored. Id. at 2278-79; compare also id. at 281 ("[N]othing in the Constitution . . . prohibits any public school student from praying . . . . But the religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer.") (emphasis added). In this case, the text setting forth the Duval County policy contains no language approving an "invocation" and no other provision that could fairly be read to require or approve a "religious" theme.

These important facts demonstrate why Santa Fe is distinguishable from this case, and more particularly why the speech at issue here -- unlike the speech contemplated by the Santa Fe policy -- cannot reasonably be described as state-sponsored. These key facts also help illustrate why the speech permitted by Duval County cannot reasonably be described as state "coercion" of religion.

17

The linchpin of the Court's analysis on this issue was its finding that Santa Fe's policy "subject[ed] the issue of prayer to a majoritarian vote."  120 S. Ct. at 2281; see also id. at 2283 ("Simply by establishing this school-related procedure, which entrusts the inherently nongovernmental subject of religion to a majoritarian vote, a constitutional violation has occurred.").  In essence, the Court found that the policy, by specifically permitting students to vote upon an "invocation" and authorizing school officials to ensure that any message proposed by the chosen student was "appropriate," made it virtually impossible for the election to be anything other than a referendum on conducting prayer.  Indispensible to this analysis was the school district's unambiguous concession that the vote authorized by the policy was indeed a vote up-or-down on prayer:

> The Chief Justice contends that we have "misconstrue[d] the nature . . . [of] the policy as being an election on 'prayer' and 'religion.'"  We therefore reiterate that the District has stipulated to the facts that the most recent election was held "to determine whether a student would deliver prayer at varsity football games," that the "students chose to allow a student to say a prayer at football games," and that a second election was then held "to determine which student would deliver the prayer."

120 S. Ct. at 2283 n.24 (citations omitted).  There has been no such critical concession in this case, and it cannot plausibly be argued that, on its face, the Duval County policy calls for a student vote on whether to mandate the inclusion of prayer in a graduation ceremony.

18

The Duval County policy, unlike the Santa Fe policy, does not subject the issue of prayer to an up-or-down vote; students do not vote on whether prayer, or its equivalent, should be included in graduation ceremonies. Rather, students vote on two questions that do not expressly or inherently concern prayer: (1) whether to permit a student "message" during the ceremony, and (2) if so, which student is to deliver the message. Santa Fe does not remotely state or suggest that the term "message" connotes prayer, nor could it plausibly give so narrow a meaning to so broad a term. Instead, the Court repeatedly focused on the Santa Fe policy's use of the additional term "invocation," and drew from that term and the school district's concessions the conclusion that Santa Fe's policy mandated a vote on prayer. See id. at 2277. Similarly, there is no suggestion in Santa Fe that the terms "opening" and "closing" as used in Duval County's policy connote prayer. Indeed, those terms did not even appear in Santa Fe's policy. Simply put, "[w]hatever majoritarian pressures are attendant to a student-led prayer pursuant to a direct student plebiscite on prayer are not facially presented by the Duval County policy." 206 F.3d at 11083 (emphasis added).

Although it is possible that under Duval County's policy the student body may select a speaker who then chooses on his or her own to deliver a religious message, that result is not preordained, and more to the point would not reflect a

19

"majority" vote to impose religion on unwilling listeners. Rather, it would reflect the uncensored and wholly unreviewable decision of a single student speaker. It cannot seriously be argued that Duval County's policy ensures that persons with "minority" views will <u>never</u> prevail in the student electoral process, whether we define "minority" in this context as persons opposed to the delivery of student-selected speech at graduation, persons opposed to the delivery of religious messages generally, or persons opposed to the delivery of a religious message that does not coincide with their chosen faith. In fact, the limited record before us proves just the opposite; in seven of the 17 instances reflected in the record, students voted for no message at all or for a student speaker who subsequently delivered an entirely secular message. 206 F.3d at 1083-84. Yet in <u>Santa Fe</u>, the Court rested its holding in large part on the assumption that "the majoritarian process implemented by the district <u>guarantees</u>, by definition, that minority candidates will <u>never</u> prevail and that their views will be effectively silenced." 120 S. Ct. at 2276 (emphasis added).[2]

---

[2]In his dissent, Judge Carnes asserts that "[t]he majority of the senior class selects and endorses the message because the majority selects the messenger." <u>Infra</u> at 44. But we think Judge Carnes's core assumption -- that the student speaker is nothing more than a puppet to give voice to the student body majority's demands for prayer -- is deeply flawed. To begin with, it ignores the express language of the policy, which does not allow (indeed, forbids) any regulation of the content of the speech. Under Duval County's policy, the student is free to give whatever message

20

For all of these reasons, the private speech delivered by a student pursuant to the Duval County policy does not become state-sponsored as a matter of law simply by virtue of the logic of Santa Fe.

Santa Fe also does not alter the analysis under the three-part test of Lemon. Santa Fe only addresses one part of the Lemon test: whether the policy at issue has a secular purpose. 120 S. Ct. at 2282-83. The Court's treatment of this issue, however, underscores the differences between the Santa Fe policy and this policy. As discussed above, the text setting forth the Duval County policy does not evince a religious purpose. The text of the Santa Fe policy unambiguously did precisely that, a fact upon which the Court placed great emphasis. Id. at 2282 ("the text of the . . . policy alone reveals that it had an unconstitutional purpose").

---

he chooses, regardless of whether that message comports with the views on religion, school prayer, or any other subject held by the majority that elected him. Ignoring the language of the policy is particularly dangerous where, as here, we are considering only a facial challenge, in which the primary focus by definition must be the text. Judge Carnes's reasoning also takes no account of students' ability -- and willingness -- to exercise the free and untrammeled speech authorized by the policy. Graduating seniors are squarely on notice, from the very language of the policy, that any speaker they may choose will have complete autonomy over the message he eventually delivers at graduation. Students recognize this fact when voting in favor of a message, and the speaker himself recognizes that fact in choosing what kind of message to deliver. The notion that "the content of the message is censored in advance through the majority selection process," infra at 47, is as pessimistic about the exercise of First Amendment freedoms as it is hostile to the text of the policy.

21

The Supreme Court's additional discussion of circumstances surrounding enactment of the Santa Fe policy is not inconsistent with our prior en banc opinion. We did not decline to explore the background to the Duval County policy. On the contrary, we did so at considerable length, concluding that "whether standing alone or in concert," the evidence marshaled by the Appellants to allege that the policy's secular purpose was a sham "cannot strip the policy of a secular purpose." 206 F.3d at 1089; see generally id. at 1086-89. More to the point, we found specifically that the limited record before us did not permit us "to fairly infer the motivation of those who promulgated or distributed the policy." Id. at 1086. Obviously, nothing in Santa Fe resolves that inescapable threshold problem.[3]

_____

[3]Much of Judge Kravitch's dissent is devoted not to considering Santa Fe, but rather to disputing this Court's conclusion in its prior en banc opinion that the Duval County policy has a secular purpose. As we have emphasized, nothing in Santa Fe in any way affects our earlier findings on that issue, which were based on the unique record of this case. Of the dissent's remaining objections, only two points need be noted separately. First, contrary to the dissent's suggestion, our prior opinion did not turn on an assumption that the school district created a public forum at graduation. We simply observed in passing that "[i]n one sense" such an analogy could be drawn. 206 F.3d at 1077. Second, contrary to the dissent's suggestion, we plainly did not reject the Appellants' facial challenge because it was premature. Instead, we expressly rejected that challenge on the merits. See id. at 1090-91. Finally, we observe that the dissent does not answer our discussion of the two critical distinctions between this case and Santa Fe (the absence here of content regulation and a policy that by its terms invites religious messages). Although we certainly agree that those facts were not the only ones considered by the Court in Santa Fe, they were absolutely essential to the Court's decision, and simply are not present in this case.

22

Moreover, the circumstances at issue in <u>Santa Fe</u> were vastly different in several important respects. Among other distinctions, the final version of the Santa Fe policy was found to be nothing more than the product of <u>repeated</u> efforts by the school district to inject prayer and other religious activities into school events even after <u>Lee. v. Weisman</u>. <u>See</u> 120 S. Ct. at 2272-73; <u>see also</u> <u>id.</u> at 2279 (describing Santa Fe's policy as nothing more than a direct "evolution . . . from the long-sanctioned office of 'Student Chaplain'"). In addition, in <u>Santa Fe</u>, school officials stated unabashedly that the policy was designed to permit a student vote for prayer at graduation. Quite simply, <u>Santa Fe</u> does not undermine our finding that Duval County's policy, on this record in this facial challenge, has a secular purpose.

B.

For the reasons we have discussed, the facts of <u>Santa Fe</u> are not so similar to the facts of this case as to require us to alter our prior decision. On the contrary, the differences between this case and <u>Santa Fe</u> are substantial and material. The only basis for us to alter our prior decision, therefore, would be if the Supreme Court had promulgated new rules of law that we failed to apply in our prior decision. The Court did no such thing, however. The analysis in <u>Santa Fe</u> proceeded under the very same framework of <u>Lee</u> and <u>Lemon</u> that we applied in our prior decision.

23

The Supreme Court did not rule that an election process itself is always incompatible with the Establishment Clause. Nor did it rule that a student elected to speak to the student body is necessarily a state-sponsored speaker. Rather, the Court stressed that it was not invalidating all student elections, but merely concluding on the facts before it "that the resulting religious message under this policy would be attributable to the school, not just the student." Id. at 2283 n.23.[4]

Second, the Court did not rule that, simply because the speech at issue is "authorized by a government policy and took place on government property at a government-sponsored school-related event," it always constitutes state-sponsored speech. On the contrary, the Court expressly acknowledged that "not every message delivered under such circumstances is the government's own." Santa Fe, 120 S. Ct. at 2275. What turns private speech into state speech in this context is, above all, the additional element of state control over the content of the message.

_____

[4]The Court did remark that "student elections that determine, by majority vote, which expressive activities shall receive or not receive school benefits are constitutionally problematic." 120 S. Ct. at 2276 (citing Board of Regents of Univ. of Wis. Sys. v. Southworth, 120 S. Ct. 1346 (2000)). As noted above, however, the Duval County policy does not mandate a student election to determine by majority vote whether school facilities should be used to disseminate a religious message at graduation. The "expressive activities" as to which students vote -- whether to permit a student to deliver a message (totally unreviewable and uncensored by the state) at graduation, and who if anyone may deliver the message of his or her choosing -- are neutral.

24

Id. at 2275-76. But it is the element of potential censorship, and the attendant risk recognized by Santa Fe that non-religious messages (or messages hostile to religion) will be suppressed, that is conspicuously absent from the record of this case. Notably, in our prior en banc opinion, we explained how affording students the opportunity to vote on whether or not to have a message that would be entirely of the student's choosing bore no more the imprimatur of the state than the process of selecting a homecoming queen. 206 F.3d at 1082. Presented with a similar "prom queen" argument by the dissenters in Santa Fe, the Court gave as its only distinction "[t]he fact that the District's policy provides for the election of the speaker only after the majority has voted on her message . . . ." 120 S. Ct. at 2276 n.15. That distinction plainly does not exist in this case.

Third, our prior en banc opinion fully considered the purpose of the Duval County policy. Accordingly, the opinion is consistent with the Supreme Court's observation that "[o]ur Establishment Clause cases involving facial challenges . . . have not focused solely on the possible applications of the statute, but rather have considered whether the statute has an unconstitutional purpose." Id. at 2281.[5]

---

[5]In our prior en banc opinion we observed that "[a] facial challenge to be successful 'must establish that no set of circumstances exists under which the Act would be valid.'" 206 F.3d at 1083-84 (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). We did not decide the appeal on that basis, however, and made that observation in connection with explaining why one of Appellants' arguments on a

Finally, our conclusion that the purpose of Duval County's policy is secular did not turn entirely or even largely on our finding that one of the purposes of the policy is to "allow students to solemnize graduation." 206 F.3d at 1085. As noted above, we identified <u>three</u> genuine secular purposes driving the policy; permitting solemnization of this seminal education experience is only one of those purposes. In any event, the Court's own words demonstrate that it was <u>not</u> purporting to declare that the desire to solemnize so important and isolated an educational event as a graduation ceremony is never a secular purpose. On the contrary, the Court merely said that "regardless of whether one considers a sporting event an appropriate occasion for solemnity, the use of an invocation to foster such

_____

subject other than the purpose of the statute was more suited to an as-applied challenge. 206 F.3d at 1083 ("Appellants also assume that allowing the senior class to vote whether to have a graduation 'message' unrestricted in content and to select an autonomous student speaker will have the effect of coercing any chosen speaker into placating the majority's religious sensibilities by offering a sectarian message of which the majority approves. This argument is highly remote and speculative [and also] would be far better suited to an as-applied challenge . . . ."). Moreover, the Court did not hold that government action violates the Establishment Clause simply by virtue of the fact that it has a non-secular purpose along with one or more secular purposes. On the contrary, the Court reiterated that under the <u>Lemon</u> standard, a court must invalidate a statute only if it lacks "'<u>a</u> secular legislative purpose.'" 120 S. Ct. at 2282 (quoting <u>Lemon</u>, 403 U.S. at 612) (emphasis added). The Court viewed the Santa Fe policy as having a single, wholly religious purpose and no secular purpose. <u>See, e.g.</u>, 120 S. Ct. at 2282. By contrast, in this case the plaintiffs did not establish -- and we did not find -- a sectarian purpose. Rather, we have found, after painstaking review of the entire record, that the policy had genuinely secular purposes.

solemnity is impermissible when, in actuality, it constitutes prayer sponsored by the school." 120 S. Ct. at 2279. As discussed above, the Duval County policy does not call for an "invocation," and does not on its face sponsor prayer.

The issue before us today is extremely narrow: whether in light of Santa Fe we should alter our prior en banc decision in this case. We conclude that the answer is no. Indeed, by its reasoning Santa Fe reinforces the crucial point that "[t]he total absence of state involvement in deciding whether there will be a graduation message, who will speak, or what the speaker may say combined with the student speaker's complete autonomy over the content of the message [means] that the message delivered, be it secular or sectarian or both, is not state-sponsored." 206 F.3d at 1071.

The Court in Santa Fe had every opportunity to declare that all religious expression permitted at a public school graduation ceremony violates the Establishment Clause; it did not do so. We could not invalidate Duval County's policy, on its face, without taking the very step the Court declined to take. Santa Fe does not alter our prior en banc decision, nor does it erase the critical facts -- the complete absence in the text of code words such as "invocation" unequivocally connoting religion, the policy's outright prohibition on state content review of non- or -anti-religious messages, the lack of any evidence (let alone stipulation as in

27

Santa Fe) that students must vote up-or-down on prayer, and the sparseness of the record, to name a few -- that underlay our opinion. Accordingly, we reinstate our original en banc decision and judgment in favor of the County.[6]

**OPINION AND JUDGMENT REINSTATED**.

---

[6]The Movants-Intervenors' "motion to clarify intervention status" is denied.

KRAVITCH, Circuit Judge, dissenting, in which ANDERSON, Chief Judge, CARNES and BARKETT, Circuit Judges, join:

When the Supreme Court granted certiorari in this case and vacated this Court's en banc decision, it directed us to address the single issue whether the Duval County policy on graduation messages survives Establishment Clause scrutiny in light of the Supreme Court's decision in Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290 (2000). See Adler v. Duval County Sch. Bd., 121 S. Ct. 31 (2000). As a lower court, we are bound to follow rulings of the Supreme Court; thus our sole task today is to reevaluate the Duval policy in accordance with the legal principles enumerated in Santa Fe. A review of the Santa Fe decision and the record in this case convinces me that the Duval County policy is facially unconstitutional. Therefore, I respectfully dissent from the majority opinion reinstating this court's prior en banc decision.

In Santa Fe, the Supreme Court held that a school district policy permitting the student body to select by majority vote a student to deliver a "statement or invocation" prior to high school football games facially violates the Establishment Clause. 530 U.S. at 317. It further decided several corollary issues pertinent to our analysis here. First, the Court noted that the school district did not create a public forum by allowing a single student to deliver a statement or invocation prior to football games. Id. at 303 (stating that "selective access does not transform

29

government property into a public forum") (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 47 (1983)). This conclusion belies the assertion in this Court's prior en banc opinion that "[i]n one sense, the [Duval] policy can be analogized to a line of open forum cases in which the Supreme Court has held that neutral secular policies that merely accommodate religion or individual free exercise rights do not amount to an unconstitutional state endorsement of religion." See Adler v. Duval County Sch. Bd., 206 F.3d 1070, 1077 (11th Cir. 2000) (en banc).

Second, the Court in Santa Fe flatly rejected the school district's argument that a facial challenge to the validity of the District's policy is premature until a student actually delivers a solemnizing message under the policy. See 530 U.S. at 313-14 (explaining that even if a student never delivers a prayer pursuant to the District's policy, a constitutional violation occurs by "the mere passage . . . of a policy that has the purpose and perception of governmental establishment of religion"). The Supreme Court's decision on this issue negates the proposition in this court's prior en banc opinion that because the Duval policy does not by its terms guarantee that a prayer will be delivered at every graduation, a facial challenge to the policy is premature. See Adler, 206 F.3d at 1083-84. Despite the majority's position, the Supreme Court makes clear in Santa Fe that facial

30

Establishment Clause challenges must not focus "solely on the possible applications of the statute, but rather [on] whether the statute has an unconstitutional purpose." Santa Fe, 530 U.S. at 314 (emphasis added). This Court's prior en banc opinion states that "[a] facial challenge to be successful 'must establish that *no* set of circumstances exists under which the Act would be valid.'" Adler, 206 F.3d at 1083-84 (emphasis in original; citation omitted). What the opinion overlooks is that, under Santa Fe, if the Duval policy has an unconstitutional purpose, then there is no set of circumstances under which the policy would be valid, notwithstanding that some of the graduation messages delivered pursuant to the policy might be totally devoid of religious content. See 530 U.S. at 314.

Finally, the Santa Fe Court explicitly determined that the election mechanism in the District's policy did not render the policy immune to constitutional scrutiny. See 530 U.S. at 304-05 ("[S]tudent elections that determine, by majority vote, which expressive activities shall receive or not receive school benefits are constitutionally problematic . . . . '[F]undamental rights may not be submitted to vote; they depend on the outcome of no elections.'") (citation omitted). The Supreme Court's decision on this issue renders untenable the majority's position that the Duval policy survives constitutional scrutiny because

31

the school board "did not have control over the elements which are most crucial in the Establishment Clause calculus: the selection of the messenger, the content of the message, or most basically, the decision whether or not there would be a message in the first place." Adler, 206 F.3d at 1080. The majority's reasoning ignores the fact that Duval's "majoritarian election might ensure that *most* of the students are represented, [but] does nothing to protect the minority." See Santa Fe, 530 U.S. at 305. Indeed, the very mechanism that the majority of this Court claims removes any impermissible coercion from the Duval policy serves to silence students espousing minority views, and forces them to participate in a state-sponsored exercise in which the message is determined by students holding majority views. The First Amendment does not permit such coercion. See id. at 317 ("Simply by establishing this school-related procedure, which entrusts the inherently nongovernmental subject of religion to a majority vote, a constitutional violation has occurred.").

Although the policy at issue in Santa Fe and the Duval policy are not identical, their few distinctions are without significant differences, such that the Supreme Court's opinion in Santa Fe compels the conclusion that the Duval policy also facially violates the Establishment Clause. A minor distinction between the Santa Fe policy and the Duval policy is that the Santa Fe policy dealt with football

32

games, whereas the Duval policy deals with graduation. This distinction is insignificant because the Supreme Court in Santa Fe implied that graduation prayers are more offensive to the Establishment Clause than are football game prayers because "we may assume that . . . the informal pressure to attend an athletic event is not as strong as a senior's desire to attend her own graduation ceremony." Id. at 311. A second distinction is that the Santa Fe policy allowed students to vote whether to have a "statement or invocation," whereas the Duval policy allows students to vote whether to have a "message." This too is a distinction without a difference. Although a "message" is a more general type of address than an "invocation," the mere use of the less specific word "message" in its text will not shield Duval County's policy from Establishment Clause scrutiny, because such scrutiny must include an examination of the policy's purpose, history, and the context in which it was adopted to determine whether the policy has a permissible secular purpose or an impermissible religious one. See id. at 308 ("When a governmental entity professes a secular purpose for an arguably religious policy, . . . it is nonetheless the duty of the courts to 'distinguis[h] a sham purpose from a sincere one.'") (citation omitted). "It is therefore proper, as part of this facial challenge, for us to examine the purpose of the [Duval] policy. . . . We [must] refuse to turn a blind eye to the context in which this policy arose, and that

33

context quells any doubt that this policy was implemented with the purpose of endorsing school prayer." Id. at 314-15.

The majority, by extracting the core policy from the remaining text of the memorandum promulgating the policy (the "Policy Memo"),[1] ignores the mandate

---

[1]The Policy Memo was entitled "GRADUATION PRAYERS" and stated:

"You will recall that after the 1992 Supreme court case of Lee v. Wiseman [sic], you received a memorandum from me instructing that because of the decision, we would no longer be able to have prayers at graduation ceremonies. Most of you have recently been bombarded with information, as have I, regarding whether or not student initiated and led prayers are acceptable based upon a recent Fifth Circuit opinion. The purpose of this memorandum is to give you some guidelines on this issue if the graduating students at your school desire to have some type of brief opening and/or closing message by a student.

This area of the law is far from clear at this time, and we have been threatened by lawsuits from both sides on the issue depending on what action we take. The key to the Lee v. Wiseman [sic] decision was that the prayer given at that graduation ceremony was directed and initiated by the school system, which made it unconstitutional, rather than by permissive student choice and initiative. With that premise in mind, the following guidelines may be of some assistance:

1. The use of a brief opening and/or closing message, not to exceed two minutes, at high school graduation exercises shall rest within the discretion of the graduating senior class;

2. The opening and/or closing message shall be given by a student volunteer, in the graduating senior class, chosen by the graduating senior class as a whole;

3. If the graduating senior class chooses to use an opening and/or closing message, the content of that message shall be prepared by the student volunteer and shall not be monitored or otherwise reviewed by Duval County School Board [sic], its officers or employees;

34

of the Supreme Court that an evaluation of the purpose of a policy like Santa Fe's or Duval's is not complete without an examination of the context in which the policy was enacted. See id. at 308 ("The text and history of this policy, moreover, reinforce [the] objective student's perception that . . . prayer is, in actuality, encouraged by the school."). By considering only the terms of the policy itself, the majority fails to address contextual evidence that evinces an impermissible religious purpose.

First, the Policy Memo is entitled "GRADUATION PRAYERS."[2] Although a statute's title cannot limit or extend the statute's plain meaning, titles are "tools available for the resolution of a doubt." Brotherhood of R. R. Trainmen v. Baltimore & O. R. Co., 331 U.S. 519, 529 (1947). Here, we are charged with resolving the issue whether the purpose of a school policy allowing student "messages" at graduation is to endorse prayer at graduation. See Lemon v. Kurtzman, 403 U.S. 602, 612 (stating that in order to survive Establishment Clause scrutiny, a challenged provision must, inter alia, "have a secular legislative

_____

The purpose of these guidelines is to allow students to direct their own graduation message without monitoring or review by school officials."

[2]Interestingly, the policy that the Supreme Court struck down in Santa Fe did not contain the word "prayer," although earlier versions of the Santa Fe policy were entitled "Prayer at Football Games."

purpose"). It is proper, therefore, for us to look to the Policy Memo's title in order to resolve any doubts we may have that the policy has a secular purpose. A policy with the word "prayer" in its title is more likely to have a religious purpose than a policy not similarly styled.

Second, the text of the Policy Memo indicates that the policy is intended as an "end run" around the law against state-sponsored graduation prayers set forth in Lee v. Weisman, 505 U.S. 577 (1992). The Policy Memo begins by stating that after Lee, the policy's author circulated a memo instructing that "we would no longer be able to have prayers at graduation ceremonies." The Policy Memo then presents the new issue "whether or not student initiated and led prayers are acceptable" (second emphasis added), and states that "[t]he purpose of this memorandum is to give you some guidelines on this issue . . . " (emphasis added). The words "on this issue" can only mean prayer. This preamble to the Duval policy thus makes clear that the policy's purpose is to create a vehicle for the delivery of student-initiated–as contrasted with school-initiated–prayers at graduation. Indeed, the second paragraph of the policy's preamble states that the "key" to the Lee decision "was that the prayer given at that graduation ceremony was directed and initiated by the school system, which made it unconstitutional, rather than by permissive student choice and initiative" (emphasis added). The

36

Policy Memo then sets forth the Duval policy "with that premise in mind," which indicates that the policy's purpose is to endorse student-initiated rather than school-initiated prayers at graduation, not merely to allow students to deliver a generic message.

The Duval policy's purpose of endorsing student-initiated prayer at graduation is evidenced further by the discussion among school board members during the meeting in which the board rejected a proposal to institute a "moment of silent meditation" at graduation in lieu of the policy allowing student "messages." The transcript of that meeting, which contains seventeen instances of the words "prayer," "pray," or "prayed," conveys the context in which the Duval policy implicitly was adopted, and shows that the board adopted the policy in an effort to make prayer a part of graduation.[3]  Finally, the very terms of the Duval policy belie any purpose other than that of increasing the probability that graduation ceremonies will include prayer:  the student "messages" are to be delivered at the beginning or end of the ceremony (a time typically reserved for prayers), and are to be no longer than two minutes (a duration consistent with a prayer).

_____

[3]For example, one board member remarked that "in good conscience I cannot vote [in favor of] silent meditation when we all know that in the past someone has prayed out loud to thank the Lord . . . ."

37

Because the record reflects that the purpose of the Duval policy is to endorse prayer at graduation ceremonies, and because the scheme allowing the student majority to decide whether to include prayer does not cure the problem of the policy's impermissible, religious purpose, in my view the Duval policy fails to comply with the Supreme Court's directive in <u>Santa Fe</u> and thus facially violates the Establishment Clause.  The majority attempts to escape this conclusion by emphasizing the fact that under the Santa Fe policy, the student election was to be conducted "[u]pon the advice and direction of the high school principal," and the student speaker's message was required to be "consistent with the goals and purposes of this policy," whereas the Duval policy placed no restrictions on the election, and stated that the student's message "shall not be monitored or otherwise reviewed by Duval County School Board, its officers or employees."  These distinctions do not save the Duval policy, however, because it was enacted for the impermissible purpose of increasing the probability that a prayer will be delivered at graduation, and because the majoritarian procedure for selecting a speaker ensures that minority viewpoints will be silenced, and that those possessing such viewpoints will be forced to participate in the majority's "message."  The majority opinion concludes that there is no Establishment Clause violation in this case because, according to the majority, the <u>Santa Fe</u> Court relied mainly on two facts,

38

which are not present here, in reaching its result: "(1) the speech [in <u>Santa Fe</u>] was 'subject to particular regulations that confine the content and topic of the student's message,' and (2) the policy, '<u>by its terms</u>, invites and encourages religious messages.'" (citations omitted). It was not solely the existence of two facts, however, but rather a contextual analysis of the District's entire policy, including its history and purpose, that persuaded the <u>Santa Fe</u> Court that the policy impermissibly coerced students to participate in a religious exercise chosen by the majority of the graduating class.

Finally, the majority opinion makes the overbroad assertion that "it is impossible to say that the Duval County policy <u>on its face</u> violates the Establishment Clause without effectively banning <u>all</u> religious speech at school graduations, no matter how private the message or how divorced the content of the message may be from any state review." This simply is not true. The Supreme Court emphasized in <u>Santa Fe</u> that "nothing in the Constitution as interpreted by this Court prohibits any public school student from voluntarily praying at any time." 530 U.S. at 313; <u>see also</u> <u>Adler</u>, 206 F.3d at 1106 n.32 (Kravitch, J., dissenting) ("Nothing in this dissent suggests that all religious expression at a public high school graduation would run afoul of the Establishment Clause. . . . Audience members could pray quietly in their seats, and students could organize a

39

prayer service immediately before or after the graduation ceremony."). Prayer at graduation does not by itself violate the First Amendment. If, however, "the 'degree of school involvement' makes it clear that the [graduation] prayers bear 'the imprint of the state,'" then a constitutional violation has occurred. See Santa Fe, 530 U.S. at 305 (quoting Lee, 505 U.S. at 590). A policy aimed at encouraging the delivery of a majority-selected prayer via the school's public address system at a "regularly scheduled, school-sponsored function conducted on school property," 530 U.S. at 307, does not merely facilitate the free exercise of religion; it promotes the establishment of the majority's religion,[4] and thus violates the Constitution. Therefore, respectfully I dissent.

---

[4]Because at graduation the majority-elected student delivers her message at a preordained point in a program planned by school officials who determine the place, time, attire, and all other aspects of the ceremony, "members of the listening audience must perceive the [student's] message as a public expression of the views of the majority of the student body delivered with the approval of the school administration." See Santa Fe, 530 U.S. at 308.

CARNES, Circuit Judge, dissenting, in which ANDERSON, Chief Judge, and BARKETT, Circuit Judge, join:

I join Judge Kravitch's dissenting opinion in its entirety and write separately to add a few points of my own.

When this case was last before us, I joined the majority opinion in large part because it reasoned, I thought correctly, that "[a] facial challenge to be successful 'must establish that <u>no</u> set of circumstances exists under which the Act would be valid.'" <u>Adler v. Duval County School Bd.</u>, 206 F.3d 1070, 1083 - 84 (11th Cir. 2000) (en banc) (quoting <u>United States v. Salerno</u>, 481 U.S. 739, 745, 107 S.Ct. 2095 (1987), and I was not convinced that had been established insofar as the Duval County policy is concerned. But the Supreme Court has now unequivocally held that principle of facial challenge law does not apply in the Establishment Clause area. <u>Santa Fe Indep. School Dist. v. Doe</u>, 530 U.S. 290, 313-17, 120 S.Ct. 2266, 2281-2283 (2000). Since that prop has been knocked out from under our reasoning, and in light of the additional guidance the <u>Santa Fe</u> decision has given us, I am persuaded that the conclusion I reached before is wrong. The Duval County "Graduation Prayers" policy is facially unconstitutional under the Establishment Clause.

In discussing what we should do with this case in light of <u>Santa Fe,</u> the majority opinion approaches the matter as though the question were whether <u>Santa</u>

41

Fe requires us to alter our prior en banc decision in this case. That approach is weighted too heavily in favor of inertia. The question is less about what <u>Santa Fe</u> requires than it is about what the Establishment Clause, read in light of <u>Santa Fe</u>, permits. We are not bound in any respect by our prior, vacated decision, but instead are free to revisit any and all issues addressed in it. <u>See</u> <u>Moore v. Zant</u>, 885 F.2d 1497, 1501-03 (1989) (en banc). For that reason, we ought to spend less time comparing the factual and procedural details of the <u>Santa Fe</u> case to this one and more time considering the lessons that decision teaches.

One of those lessons is that a school board may not delegate to the student body or some subgroup of it the power to do by majority vote what the school board itself may not do. <u>Santa Fe</u>, 530 U.S. at 304-12, 120 S. Ct. at 2276-80. We should apply that lesson to what we have recognized as the "elements which are most crucial in the Establishment Clause calculus." <u>Adler</u> 206 F.3d at 1080. We agreed when this case was last before us that the "most crucial" elements in our decision were "the selection of the messenger, the content of the message, or most basically, the decision whether or not there would be a message in the first place." <u>Id</u>. It is undisputable that under the Duval County policy, whether there is a message and the selection of the messenger are decided by majority vote of the students in the senior class. That means those two of the three "most crucial"

42

elements weigh against the constitutionality of the policy, because a school board policy may not authorize a student majority to do what the Establishment Clause prohibits the board itself from doing.

The other of what we termed the three "most crucial" elements of the Establishment Clause calculus is the content of the message. In our pre-Santa Fe decision, we took refuge in what we repeatedly described as the "autonomy" of the student-selected messenger, relying upon what we characterized as her "complete autonomy" over the message. See, e.g., Adler, 206 F.3d at 1071 ("the student speaker's complete autonomy over the content of the message"); id. ("how autonomous the speaker may be in crafting her message"); id. at 1074 (it "does not violate the Establishment Clause merely because an autonomous student speaker may choose to deliver a religious message"); id. at 1077 ("The graduation policy . . . allows an autonomous elected speaker, selected by her class, to deliver a religious or secular message on an equal basis."); id. at 1079 ("and the student has complete autonomy over content"). That supposed autonomy is also a crucial premise of the reasoning in the present majority opinion. And a faulty one.

Santa Fe makes clear what should have been apparent all along: the messenger is not autonomous from the majority who chooses her any more than a political figure is autonomous from the majority who selects him. The majority

43

opinion attempts to deal with this truth by characterizing the dissent as assuming that the popularly elected representative of the student majority will be "nothing more than a puppet to give voice to the student body majority's demands for prayer." Majority Op. at 21 n.2. I do not assume that any more than we assume that a popularly elected official, selected after a one-issue campaign, will be no more than a puppet for the majority which elects him. The messenger need not be puppetized in order to serve the majority will. There will be among the majority of students who desire prayer at graduation any number of people who are more than happy to deliver the prayer themselves, just as there are some politicians who genuinely do believe in the same policies that they espouse in order to get elected.

The majority of the senior class selects and endorses the message because the majority selects the messenger. All the majority has to do to ensure that a religious message is delivered at graduation is select as its messenger one whom it can rely upon to give such a message. There is no reason at all to believe that will be difficult to do. The Supreme Court in Santa Fe presumed that there would be debate before each of two elections authorized by the policy of the school board in that case. See 530 U.S. at 310-11, 120 S.Ct. at 2279-80 ("The two student elections authorized by the policy, coupled with the debates that presumably must precede each, impermissibly invade that private sphere."). And there is no reason

44

not to presume the same in this case. After all, that is how majority rule is typically exercised in a democratic setting. Issues are discussed and debated, and then a vote is taken to ascertain the will of the majority. Unlike the majority opinion, id. at 21 n.2, I do not think it is "pessimistic" to assume that election processes will result in selection of a representative who can be relied upon to carry out the will of the majority of those who vote. To the contrary, faith in the notion that the majority can and will select representatives who will carry out its will is the optimistic assumption behind democracy.

It would be naive to expect the debate over the first question subjected to majority rule by the Duval County policy not to include discussion about whether there should be prayer. Prayer is what gave rise to the aptly named "Graduation Prayers" policy. Prayer is what a majority of people expect and usually want to hear at graduation. Once the majority will is expressed in favor of a student-delivered message, all the majority has to do to ensure that message includes prayer is select someone who can be counted upon to deliver a prayer. If there is any doubt about who will do so, that doubt can be resolved in the usual way that candidates' positions are identified in a democracy – through campaigning and debate. Insofar as we can tell, the policy seems to have worked as intended for the most part. Approximately sixty percent of the times when the policy has been

applied, it has resulted in student-led prayer at graduation. Sixty percent is not perfection, but it is close enough for government work, and Duval County's "Graduation Prayers" policy is government work.

Duval County's "Graduation Prayers" policy may serve as a valuable teaching tool to show students how issues can be decided by majority vote and how representatives can be selected to carry out the will of the people. The problem is that because of the First Amendment religious issues are not supposed to be decided by vote of the people, and the majority should not be allowed to force its religious views on those in the minority. Our Constitution ensures that when it comes to religion, it is the conscience of the individual rather than the will of the majority that rules. The lesson the students are being taught under the Duval County policy conflicts with the Establishment Clause.

The majority opinion concludes that no reasonable person attending a graduation ceremony could view the message the selected student delivers "as one imposed by the state." Majority Op. at 16. I believe that a reasonable person could view the message delivered by a student messenger, who is selected by a majority of the senior class to deliver the message, as one reflecting the views of the majority. And where a governmental unit, such as a school board, allows its power and authority to be wielded according to the will of a majority of students, the

46

resulting message delivered on government property during a government-controlled event is the message of government. The government endorsement of the message comes not just from the setting in which it is delivered but also from the use of government-delegated power to select the messenger and message. The identity of the messenger is controlled and the content of the message is censored in advance through the majority selection process.

Judge Kravitch's dissenting opinion ably demonstrates that the purpose of Duval County's "Graduation Prayers" policy is consistent with its name. In disputing that, the majority opinion says the policy is not about prayer, but instead is about student messages in general and permitting student participation in graduation ceremonies. Majority Op. at 7. I disagree. The policy is not entitled "Student Messages" or "Student Participation in Graduation," but "Graduation Prayers." There is nothing about a general student message or student participation that would cause the school board to dictate that it come at the beginning or end of the ceremony; that is, however, exactly when prayer traditionally occurs in a ceremony. And the board's mandate that the student "message" be no longer than two minutes comports nicely with the length of a good, short prayer. The memorandum that became the board's policy refers repeatedly not to free speech or

democratic participation cases but to a school prayer decision.  See Adler, 206 F.3d at 1072.

The "Graduation Prayers" memorandum  refers  to the board  having "been threatened by lawsuits from both sides," id., and those threatened lawsuits were not about whether there would be student participation or a student message in general, but about whether there would be prayer.  Even in our litigious society, no one sues about student participation in graduation ceremonies, but people do sue about whether prayer is allowed or prohibited at graduation and other school-related events.  In response to the threats of lawsuits from both sides about whether there would be prayer at graduation, the school board sought to pass the buck to the senior class, thereby allowing the students, in the policy's words, "to direct their own graduation message without monitoring or review by school officials."  Id. By majority vote, the students direct their own graduation message by deciding whether there will be one and who will deliver it.  And in that way a majority of the senior class determines whether its message will be prayer.  The school board policy not just permits but invites that determination by the majority regardless of the views of the minority.  As interpreted in Santa Fe, the Establishment Clause forbids that type of exercise of majority power.  Government is not allowed to aid

48

in the establishment of religion by giving a majority of students a proxy to use government power to do that which government itself may not do.