FILED
United States Court of Appeals
Tenth Circuit

May 29, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ERICA CORDER,

      Plaintiff-Appellant,

v.

LEWIS PALMER SCHOOL
DISTRICT NO. 38,

      Defendant-Appellee.

_____

THE NATIONAL LEGAL
FOUNDATION,

      Amicus Curiae.

No. 08-1293

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:07-CV-1798-WDM-MJW)**

---

Stephen M. Crampton (Mary E. McAlister, Liberty Counsel, Lynchburg, Virginia;
Mathew D. Staver, Liberty Counsel, Maitland, Florida, with him on the briefs), of
Liberty Counsel, Lynchburg, Virginia, for Plaintiff-Appellant.

W. Stuart Stuller of Caplan and Earnest LLC, Boulder, Colorado (Kristin C.
Edgar with him on the brief), for Defendant-Appellee.

Steven W. Fitschen, Virginia Beach, Virginia, (Douglas E. Myers with him on the
brief), filed an amicus curiae brief for The National Legal Foundation.

Before **BRISCOE, SEYMOUR,** and **LUCERO**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Plaintiff-Appellant Erica Corder appeals the grant of Defendant-Appellee Lewis Palmer School District No. 38's ("School District") Fed. R. Civ. P. 12(c) motion for judgment on the pleadings. Corder brought claims under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and Colo. Rev. Stat. § 22-1-120, stemming from the School District's response to Corder's valedictory speech at her high school graduation.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm the district court.

I

Corder was a student at Lewis Palmer High School and one of fifteen students named as class valedictorian for her 2006 graduating class. In most previous years, the valedictorians were each permitted to give a short speech at the school's graduation ceremony. Prior to Corder's graduation ceremony, the school principal informed the valedictorians that they could decide whether all of the fifteen valedictorians, or a subset thereof, would deliver the valedictory message. The valedictorians decided that each of them would speak for approximately thirty seconds, and they decided on a general topic for the

2

speeches.  However, before a valedictorian would be allowed to present his or her speech at graduation, the principal required each valedictorian to present his or her speech to him for his review of the speech's content.  The principal did not provide any further instruction concerning the conduct or content of the speeches.

The School District has a written policy governing student expression which prohibits a variety of types of speech such as slander and profanity, as well as speech that "[t]ends to create hostility or otherwise disrupt the orderly operation of the educational process."  Aplt. App. at 11, ¶ 26.  The policy makes no reference to religious speech.  Further, the written policy does not require students to submit their proposed expression for review or approval.  Application of the School District's written policy governing student expression is not at issue in this case, but rather Corder challenges the School District's unwritten policy of requiring students to submit their valedictory speeches for content review prior to presentation.

As required, Corder presented her speech to the school principal for his review prior to the graduation ceremony.  The speech she gave to the principal for review did not mention religion.  At the graduation ceremony, however, Corder gave a different speech.  This is the speech she gave:

> Throughout these lessons our teachers, parents, and let's not forget our peers have supported and encouraged us along the way.  Thank you all for the past four amazing years.  Because of your love and devotion to our success, we have all learned how to endure change and remain

3

> strong individuals. We are all capable of standing firm
> and expressing our own beliefs, which is why I need to tell
> you about someone who loves you more than you could
> ever imagine. He died for you on a cross over 2,000 years
> ago, yet was resurrected and is living today in heaven. His
> name is Jesus Christ. If you don't already know Him
> personally I encourage you to find out more about the
> sacrifice He made for you so that you now have the
> opportunity to live in eternity with Him. And we also
> encourage you, now that we are all ready to encounter the
> biggest change in our lives thus far, the transition from
> childhood to adulthood, to leave Lewis-Palmer with
> confidence and integrity. Congratulations class of 2006.

Id. at 11-12, ¶ 30. At the conclusion of the graduation ceremony, Corder was escorted to see the assistant principal. The assistant principal told Corder that she would not receive her diploma and that she had to make an appointment to see the principal.

Corder and her parents met with the principal five days later. Corder understood from the principal that she would not receive her diploma unless she publicly apologized for her valedictory speech. Corder did not apologize for the content of her speech, but prepared a written statement explaining that her statement reflected her own personal beliefs and was made without the principal's prior approval. The draft submitted by Corder is as follows:

> At graduation, I know some of you may have been
> offended by what I said during the valedictorian speech.
> I did not intend to offend anyone. I also want to make it
> clear that [the principal] did not condone nor was he aware
> of my plans before giving the speech. I'm sorry I didn't
> share my plans with [the principal] or the other
> valedictorians ahead of time. The valedictorians were not

4

aware of what I was going to say. These were my personal beliefs and may not necessarily reflect the beliefs of the other valedictorians or the school staff.

Id. at 13, ¶ 43. The principal required Corder to insert the following sentence into the statement: "I realize that, had I asked ahead of time, I would not have been allowed to say what I did." Id. at 13-14, ¶ 44. Corder agreed to include the sentence because the principal said he would not give Corder her diploma unless she added the sentence. Corder's statement was distributed via e-mail, and Corder received her diploma.

Corder filed suit, asserting the following claims: (1) violation of freedom of speech under the First Amendment; (2) compelled speech in violation of the First Amendment; (3) violation of the right to equal protection under the Fourteenth Amendment; (4) violation of freedom of religion under the First Amendment; (5) violation of Colo. Rev. Stat. § 22-1-120; and (6) violation of the Establishment Clause of the First Amendment.[1] Corder sought nominal damages and injunctive

_____

[1] Corder does not continue to pursue her Establishment Clause claim on appeal. An appellant's opening brief must identify "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(9)(a). "Consistent with this requirement, we routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief." Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir. 2007).

Corder's brief on appeal does not argue the Establishment Clause claim and only mentions the Establishment Clause when urging reversal of the district court's grant of summary judgment on Corder's claim under Colo. Rev. Stat. § 22-1-120.

(continued...)

5

relief. After the School District filed a motion for judgment on the pleadings

pursuant to Fed. R. Civ. P. 12(b)(1) and (c) and the parties conducted limited

discovery and then filed cross-motions for summary judgment, the district court

granted the School District's motion for judgment on the pleadings.

## II

### *Standard of Review*

We review a dismissal granted under Fed. R. Civ. P. 12(c) "under the

standard of review applicable to a Rule 12(b)(6) motion to dismiss." Nelson v.

State Farm Mut. Auto. Ins. Co., 419 F.3d 1117, 1119 (10th Cir. 2005) (internal

quotations omitted). "This court reviews de novo the district court's grant of a

motion to dismiss pursuant to Rule 12(b)(6), applying the same legal standard

applicable in the district court." Teigen v. Renfrow, 511 F.3d 1072, 1078 (10th

Cir. 2007). "In reviewing a motion to dismiss, this court must look for

plausibility in the complaint." Id. (internal quotations omitted). "Under this

standard, a complaint must include 'enough facts to state a claim to relief that is

plausible on its face.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

127 S. Ct. 1955, 1974 (2007)). "The allegations must be enough that, if assumed

---

[1](...continued)

Interestingly, Corder submitted supplemental authorities, pursuant to Fed. R. App. P. 28(j), which were Establishment Clause cases, but which Corder claimed were pertinent to other issues on appeal. We considered these cases, as well as a Fed. R. App. P. 28(j) case submitted by the School District, but do not find them relevant to our analysis of Corder's appeal.

to be true, the plaintiff plausibly (not just speculatively) has a claim for relief."[2]

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).

*Mootness*

In addition to a request for nominal damages, Corder's complaint seeks a declaration that the School District violated Corder's First Amendment and Equal Protection rights, and a declaration that the School District's unwritten policy of reviewing student graduation speeches is unconstitutional. Corder's complaint also seeks a permanent injunction against enforcement of that unwritten policy.[3] The School District argued before the district court that Corder's claims for declaratory and injunctive relief are moot, and the district court agreed.[4]

---

[2] Corder argues that the district court committed reversible error by referring to matters outside her complaint in its order on the School District's Rule 12(c) motion. See GFF Corp. v. Assoc. Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997) ("The failure to convert a 12(b)(6) motion to one for summary judgment where a court does not exclude outside materials is reversible error unless the dismissal can be justified without considering the outside materials.").

It is not evident that the district court referred to matters outside Corder's complaint, but rather merely made inferences from the facts alleged in Corder's complaint. See Archuleta v. Wagner, 523 F.3d 1278, 1283 (10th Cir. 2008) ("The court must view all reasonable inferences in favor of the plaintiff, and the pleadings must be liberally construed." (internal quotations omitted)). Regardless, because we affirm the district court's dismissal without reference to outside materials, we need not further address Corder's claim of procedural error.

[3] At oral argument, Corder's counsel clarified that Corder is no longer seeking injunctive relief, but continues to pursue her claims for nominal damages and declaratory relief.

[4] The School District did not assert mootness against Corder's claim for

(continued...)

7

Although we have jurisdiction over appeals from all final decisions of federal district courts, 28 U.S.C. § 1291, we have no subject matter jurisdiction over a case if it is moot. Unified Sch. Dist. No. 259, Sedgwick County, Kan. v. Disability Rights Ctr. of Kan., 491 F.3d 1143, 1146-47 (10th Cir. 2007). "Constitutional mootness doctrine is grounded in the Article III requirement that federal courts may only decide actual, ongoing cases or controversies." Seneca-Cayuga Tribe v. Nat'l Indian Gaming Comm'n, 327 F.3d 1019, 1028 (10th Cir. 2003) (internal quotations and alteration omitted). "It is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion—is the settling of some dispute which affects the behavior of the defendant toward the plaintiff. Hence, this court has explained that a plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured by the defendant in the future." Green v. Branson, 108 F.3d 1296, 1299-1300 (10th Cir. 1997) (internal quotations, citations and alterations omitted). We review de novo the question of whether a case is moot. Prier v. Steed, 456 F.3d 1209, 1212 (10th Cir. 2006).

"We have previously held that 'when an individual graduates from school there no longer exists a live controversy necessary to support an action to

_____

[4](...continued)
nominal damages.

8

participate in interscholastic activity.'" Lane v. Simon, 495 F.3d 1182, 1186 (10th Cir. 2007) (quoting Bauchman v. W. High Sch., 132 F.3d 542, 548 (10th Cir. 1997)). In Bauchman, a Jewish high school student challenged her choir instructor's alleged advocacy of Mormonism during classes and choir performances, but graduated from high school while the case was pending on appeal. 132 F.3d at 546. After determining that the defendant school officials "no longer ha[d] the power or opportunity to adversely affect Ms. Bauchman's constitutional rights," we dismissed her declaratory and injunctive relief claims as moot. Id. at 548; see also Fischbach v. N.M. Activities Ass'n, 38 F.3d 1159, 1160 (10th Cir. 1994) (holding that due to student plaintiff's graduation, "the power of the [defendant state activities association] to adversely affect his rights ha[d] ended" and the case was moot). In Lane, the plaintiffs were the student editors of a college newspaper, who claimed that the school had impinged on their exercise of freedom of the press. We similarly held that because the plaintiffs had graduated and no longer served on the board of the student newspaper, the plaintiffs' claims for declaratory and injunctive relief were moot. Lane, 495 F.3d at 1186-87.

Here, Corder complains that the School District's unwritten policy for requiring prior approval of graduation speeches impinges on her rights under the First Amendment and the Equal Protection Clause. Corder, however, graduated from high school in 2006 and is no longer a student under the School District's

9

control. She will never again be subject to the unwritten policies of the School District requiring prior content review of valedictory speeches. The School District no longer has the power or the opportunity to adversely affect Corder's rights as they pertain to valedictory speeches. As a result, Corder's demands for declaratory and injunctive relief are moot.

An exception to the mootness doctrine exists for cases that are "capable of repetition, yet evading review." Murphy v. Hunt, 455 U.S. 478, 482 (1982) (internal quotations omitted). But this exception applies only when: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a reasonable expectation that the same complaining party w[ill] be subjected to the same action again." Id. (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)).

Although Corder's claims arguably meet the first prong of this test, she fails to satisfy the second prong of the exception. Because only graduating seniors would fall within the unwritten policy of which Corder complains, there is no reasonable expectation that Corder will be subjected, post-graduation, to prior review of the content of a graduation speech in accordance with the School District's unwritten policy. Thus, Corder's claims for declaratory and injunctive relief do not fall within the exception to the mootness doctrine. Only Corder's claim for nominal damages for the violation of her constitutional rights remains for our review.

10

*First Amendment Free Speech Claim*

The First Amendment's free speech clause states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. As regards the treatment of a student's exercise of First Amendment free speech rights at school, two approaches have emerged: the approach in Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969), and the approach in Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988). The parties dispute which case is our proper guide for determining the appropriate classification of Corder's valedictory speech given at the graduation ceremony.

We begin by noting that the Supreme Court cases make clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker, 393 U.S. at 506. At the same time, the Court has held that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986), and that the rights of students "must be 'applied in light of the special characteristics of the school environment.'" Hazelwood, 484 U.S. at 266 (quoting Tinker, 393 U.S. at 506).

In Tinker, the Court specified that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students." 393 U.S. at 506. Tinker involved a group of high school students who planned to wear black armbands to protest the Vietnam War. Id. at

11

504. School officials learned of the plan and responded by adopting a policy prohibiting students from wearing armbands. Id. When several students nonetheless wore armbands to school, they were suspended. Id. The students sued, claiming that their First Amendment rights had been violated, and the Court agreed. Id. at 505-06.

Tinker held that student expression may not be suppressed unless school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school." Id. at 513. The only interest the Supreme Court discerned underlying the school's actions was the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," or "an urgent wish to avoid the controversy which might result from the expression." Id. at 509, 510. That interest was not enough to justify banning "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance." Id. at 508.

The Court again addressed student speech in Bethel School District No. 403 v. Fraser, 478 U.S. 675 (1986). In that case, a student was suspended for delivering a speech before a high school assembly in which he employed what the Court called "an elaborate, graphic, and explicit sexual metaphor." Id. at 678. Analyzing the case under Tinker, the district court and court of appeals found no disruption, and therefore no basis for disciplining the student. Id. at 679-80. The Supreme Court reversed, holding that the "School District acted entirely within its

12

permissible authority in imposing sanctions upon [the student] in response to his offensively lewd and indecent speech." Id. at 685.

The mode of analysis employed in Fraser is not entirely clear. The Court reasoned, however, that school boards have the authority to determine "what manner of speech in the classroom or in school assembly is inappropriate." Id. at 683. Cf. id. at 689 (Brennan, J., concurring in judgment) ("In the present case, school officials sought only to ensure that a high school assembly proceed in an orderly manner. There is no suggestion that school officials attempted to regulate [the student's] speech because they disagreed with the views he sought to express.").

We can distill two basic principles from Fraser. "First, Fraser's holding demonstrates that 'the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings.'" Morse v. Frederick, 551 U.S. 393, 127 S. Ct. 2618, 2626 (2007) (quoting Fraser, 478 U.S. at 682). Had the student in Fraser "delivered the same speech in a public forum outside the school context, it would have been protected." Id. "In school, however, [the student's] First Amendment rights were circumscribed 'in light of the special characteristics of the school environment.'" Id. at 2626-27 (quoting Tinker, 393 U.S. at 506). "Second, Fraser established that the mode of analysis set forth in Tinker is not absolute. Whatever approach Fraser employed, it certainly did not conduct the 'substantial disruption' analysis prescribed by

Tinker." Id. at 2627. See Hazelwood, 484 U.S. at 271 n.4 (disagreeing with the proposition that there is "no difference between the First Amendment analysis applied in Tinker and that applied in Fraser," and noting that the holding in Fraser was not based on any showing of substantial disruption).

The Supreme Court next addressed student speech in Hazelwood, a case that centered on "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." 484 U.S. at 271. Staff members of a high school newspaper sued their school when it chose not to publish two of their articles. Id. at 263-64. The court of appeals analyzed the case under Tinker, ruling in favor of the students "because it found no evidence of material disruption to class work or school discipline." Morse, 127 S. Ct. at 2627. The Supreme Court reversed, holding that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." Hazelwood, 484 U.S. at 273.

The Hazelwood Court made an exception to Tinker for school-sponsored speech. The Court characterized newspapers and similar school-sponsored activities "as part of the school curriculum" and held that "[e]ducators are entitled to exercise greater control over" these forms of student expression. Id. at 271. Accordingly, the Court expressly refused to apply Tinker's standard. Id. at

14

272-73.  Instead, for school-sponsored activities, the Court created a new standard that permitted school regulation of student speech that is "reasonably related to legitimate pedagogical concerns."  Id. at 273.  The Court stated:

> The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in Tinker—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech.  The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.  These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

Id. at 270-71.

And finally, in the Supreme Court's most recent student speech case, Morse, the Court affirmed that "schools may regulate some speech even though the government could not censor similar speech outside the school" and that the rule stated in Tinker "is not the only basis for restricting student speech."  127 S. Ct. at 2627 (internal quotations omitted).  In Morse, a high school student "unfurled a 14-foot banner bearing the phrase 'BONG HiTS 4 JESUS' during a school-sanctioned and supervised event."  Ponce v. Cosorro Indep. Sch. Dist., 508 F.3d 765, 768 (5th Cir. 2007) (citing Morse, 127 S. Ct. at 2622).  "The principal

15

confiscated the banner and suspended [the student]." Id. The student "filed suit under 42 U.S.C. § 1983 against the principal and the School Board, claiming that the principal's actions violated his First Amendment rights." Id. at 769.

The Morse decision "resulted in a narrow holding: a public school may prohibit student speech at school or at a school-sponsored event during school hours that the school 'reasonably view[s] as promoting illegal drug use.'" Barr v. Lafon, 538 F.3d 554, 564 (6th Cir. 2008) (quoting Morse, 127 S. Ct. at 2629). Justice Alito's concurrence stated that he joined the majority opinion "on the understanding that (a) it goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (b) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." Morse, 127 S. Ct. at 2636 (Alito, J., concurring). Justice Alito also made clear that he joined the majority only insofar as "the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions" beyond those articulated in the Supreme Court's prior student speech cases. Id. at 2637.

In Fleming v. Jefferson County School District R-1, 298 F.3d 918 (10th Cir. 2002), this court addressed student speech and held that a Columbine High School project that involved the painting of four-inch-by-four-inch memorial tiles that would be permanently affixed to the school's hallways constituted

16

"school-sponsored speech" under Hazelwood. 298 F.3d at 920-21, 924. We stated that "[t]he imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech" and derives from such factors as the level of involvement of school officials in organizing and supervising the event. Id. at 925.

We held that in order to determine whether challenged speech is school-sponsored and bears the imprimatur of the school, a reviewing court should appraise the level of involvement the school had in organizing or supervising the contested speech, and noted that certain expressive activities may be closely tied to a school, yet not school-sponsored speech bearing the school's imprimatur. Id. Such activities might include those sponsored by outside organizations who happen to use school facilities after school hours. Id. We concluded that the memorial tiles project—permitting residents to design tiles for school walls—was school-sponsored speech bearing the imprimatur of the school because it was supervised by school officials and the tiles would be permanently affixed to the school's walls. Id. at 930-31.

We then stated that the "pedagogical" concept set forth in Hazelwood merely means that the activity is "related to learning." Id. at 925. We noted that "[t]he universe of legitimate pedagogical concerns is by no means confined to the academic for it includes discipline, courtesy, and respect for authority." Id. (internal quotations and alterations omitted). We also noted that several other

17

courts have established that the pedagogical test may be satisfied "simply by the school district's desire to avoid controversy within a school environment." Id. at 925-26 (listing cases).

As we concluded in Fleming, we conclude here that this case is governed by the Hazelwood standard for school-sponsored speech.[5] We resolve this case by first asking: is the "expressive activity" at issue—a valedictory speech at graduation—a "school-sponsored . . . expressive activit[y] that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school"? Hazelwood, 484 U.S. at 271. If so, then a valedictory speech at graduation is school-sponsored speech, and the School District did not violate the "First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions

---

[5] Corder relies on an Eleventh Circuit Establishment Clause case, Adler v. Duval County School Board, 250 F.3d 1330 (11th Cir. 2001), for the argument that we should apply the holding of Tinker and conclude that her speech was private speech that happened to occur on school premises. In Adler, the Eleventh Circuit found that the student speech at graduation was private speech. Id. at 1336-37. However, the student speech at issue was from a student not chosen by the school and over whom the school exercised no editorial control. Id. at 1332. The school's written policy expressly provided that the purpose of the policy of having the students choose a student speaker was to allow selected students to speak "without monitoring or review by school officials." Id.

Adler is distinguishable from the present case in two respects: the school policy at issue, and the entity selecting the student speaker. Corder acknowledges she was chosen by the school as a valedictorian based on her 4.0 grade point average and that her valedictory speech was governed by an unwritten policy requiring submission of graduation speeches for prior review.

18

are reasonably related to legitimate pedagogical concerns." Id. at 273.

The first prong of our analysis is easy to satisfy. Corder spoke as one of fifteen valedictory speakers at her high school's graduation ceremony. Although her speech did not occur in a traditional classroom setting, the graduation ceremony was supervised by the school's faculty and was clearly a school-sponsored event: Corder's complaint states that she "qualified" as a valedictorian, Aplt. App. at 9, ¶ 14, that the valedictorians were instructed by the principal on how to organize their speech, id. at 9, ¶ 16, that the principal required the valedictorians to submit their speeches to him for review for content, id. at 11, ¶¶ 27-28, and that Corder was "escorted by a teacher" to see the assistant principal after the conclusion of the graduation ceremony, id. at 12, ¶ 31. The school limited the giving of speeches to the valedictorians, who were chosen because of their 4.0 grade point average. A high school graduation ceremony under these circumstances is "so closely connected to the school that it appears the school is somehow sponsoring the speech." Fleming, 298 F.3d at 925. As a result, on these facts—where the School District exercised control over valedictory speeches in advance of graduation, and named valedictory speakers based on the School District's qualifications, the School District was entitled to exercise editorial control over Corder's speech as long as its action was reasonably related to pedagogical concerns.

The second prong of our analysis is also satisfied. The School District's

19

policy of reviewing valedictory speeches prior to the graduation ceremony is related to learning. The giving of a speech in a community graduation ceremony certainly is a learning opportunity. A graduation ceremony is an opportunity for the School District to impart lessons on discipline, courtesy, and respect for authority. Id. ("The universe of legitimate pedagogical concerns is by no means confined to the academic for it includes discipline, courtesy, and respect for authority."). And, a School District is entitled to review the content of speeches in an effort to preserve neutrality on matters of controversy within a school environment. See Hazelwood, 484 U.S. at 272 ("A school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with 'the shared values of a civilized social order,' . . . or to associate the school with any position other than neutrality on matters of political controversy." (quoting Fraser, 478 U.S. at 683)); Fleming, 298 F.3d at 925-26 (noting that several other courts have established that the pedagogical test may be satisfied "simply by the school district's desire to avoid controversy within a school environment"). As a result, the School District's unwritten policy of reviewing valedictory speeches prior to the graduation ceremony was reasonably related to pedagogical concerns.

We cannot conclude that the "First Amendment require[d] [the] school affirmatively to promote" Corder's speech. Hazelwood, 484 U.S. at 270-71. We

20

conclude that the School District did not violate Corder's First Amendment free speech rights by requiring the review of the content of her speech prior to its presentation.

*First Amendment Compelled Speech Claim*

Corder next argues that the School District's requirement that she submit a written apology for circulation as a condition to receiving her diploma violated her First Amendment right to refrain from speaking.[6] The Supreme Court has long held that the First Amendment's freedom of speech guarantee "prohibits the government from telling people what they must say." Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 61 (2006).[7] In addition,

---

[6] Amicus National Legal Foundation argues the district court erred in dismissing Corder's compelled speech claim because "it failed to analyze that claim under the unconstitutional conditions doctrine." Amicus Br. at 1; see KT&G Corp. v. Att'y Gen. of Okla., 535 F.3d 1114, 1136 (10th Cir. 2008) ("[T]he focus of the unconstitutional conditions doctrine is on whether a governmental entity is denying a benefit to [a plaintiff] that [the plaintiff] could obtain by giving up [his or her] freedom of speech, or is penalizing [the plaintiff] for refusing to give up [his or her] First Amendment rights." (internal quotations omitted)). Amicus and all parties acknowledge, however, that this argument was not made to the district court, and we will therefore not consider it. See Tyler v. City of Manhattan, 118 F.3d 1400, 1403 (10th Cir. 1997) (concluding that a circuit court should exercise its discretion to reach an issue raised only by amicus curiae "only in exceptional circumstances").

[7] In earlier Supreme Court compelled speech cases, the Court in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642 (1943), held unconstitutional a state law requiring schoolchildren to recite the Pledge of Allegiance and to salute the flag. And in Wooley v. Maynard, 430 U.S. 705, 717 (1977) the Court held unconstitutional a state law that required New Hampshire motorists to display the state motto—"Live Free or Die"—on their license plates.

(continued...)

21

"compelled statements of fact . . . like compelled statements of opinion, are subject to First Amendment scrutiny." Id. at 62.

"In order to compel the exercise or suppression of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is regulatory, proscriptive, or compulsory in nature." Axson-Flynn v. Johnson, 356 F.3d 1277, 1290 (10th Cir. 2004) (internal quotations omitted); see also Bauchman, 132 F.3d at 557 (noting that "compulsion" is a "threshold element" of a First Amendment compelled speech claim). All parties agree: Corder was compelled to apologize for evading the principal's instructions regarding the prior review of her speech and for any offense her actions may have caused the audience.

The Supreme Court has long recognized that, for purposes of the First Amendment, forced speech is no different than censored speech. See Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 256 (1974) (noting that the challenged statute, which compelled newspapers publishing attacks on political candidates to devote equal space to replies to those attacks, "operate[d] as a command in the same sense as a statute or regulation forbidding appellant to

---

[7](...continued)
In Riley v. National Federation of the Blind, 487 U.S. 781, 796-97 (1988), a case regarding charitable organizations' rights to not include certain facts while soliciting funds, the Court noted that "in the context of protected speech . . . the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."

22

publish specified matter"); <u>Riley v. Nat'l Fed'n of the Blind of N.C., Inc.</u>, 487 U.S. 781, 796-97 ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what <u>not</u> to say."). Thus, if the School District may censor Corder because her speech is school-sponsored rather than private, then so may the School District tell her what to say when she disregards the School District's policy regarding the school-sponsored speech, as long as the compulsion is related to a legitimate pedagogical purpose. See <u>C.N. v. Ridgewood Bd. of Educ.</u>, 430 F.3d 159, 178 (3d Cir. 2005) ("School-sponsored speech may be restricted for legitimate pedagogical purposes, and it seems clear that a school may compel some speech for such purposes." (internal citation omitted)); <u>see also id.</u> at 186 ("Before exploring the contours of the First Amendment's protection of the right 'to refrain from speaking at all,' it must be recognized that this particular right is necessarily different in the public school setting.").

We have already concluded that Corder's presentation of a valedictory speech at her school's graduation ceremony involved school-sponsored speech. This conclusion also applies to Corder's forced apology. The imprimatur concept is satisfied because Corder's apology was directly related to her school-sponsored speech at the high school graduation. It occurred close in time after that

23

graduation ceremony, and was disseminated through the principal's office via e-mail to the entire Lewis-Palmer school community. As a result, the School District was free to compel Corder's speech as long as the School District's "decision was 'reasonably related to legitimate pedagogical concerns.'" Axson-Flynn, 356 F.3d at 1290 (quoting Fleming, 298 F.3d at 926). "We give 'substantial deference' to 'educators' stated pedagogical concerns.'" Id. (quoting Fleming, 298 F.3d at 925).

Corder's forced apology is also reasonably related to the School District's pedagogical concerns. The school-sponsored speech cases emphasize the discretion school officials have to ensure that "the views of the individual speaker are not erroneously attributed to the school." Hazelwood, 484 U.S. at 271; see also Fraser, 478 U.S. at 681-83 ("The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior. . . . Indeed, the fundamental values necessary to the maintenance of a democratic political system disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the work of the schools. The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school

24

board." (internal quotations and citations omitted)).

The School District's requirement that Corder apologize for her behavior is "related to learning." Fleming, 298 F.3d at 925. As we stated in Fleming, the "universe of legitimate pedagogical concerns is by no means confined to the academic for it includes discipline, courtesy, and respect for authority." Id. (internal quotations and alterations omitted) (emphasis added). The discipline chosen by the School District for Corder's giving a speech different from the one she submitted for review was to require her to write an apology before she could receive her diploma. This disciplinary action, taken in response to Corder's violation of the review policy, was certainly reasonable. "[T]he Hazelwood standard . . . 'does not require that the [restrictions] be the most reasonable or the only reasonable limitations, only that they be reasonable.'" Axson-Flynn, 356 F.3d at 1292 (quoting Fleming, 298 F.3d at 932); see also Wildman v. Marshalltown Sch. Dist., 249 F.3d 768, 771 (8th Cir. 2001) (concluding there is no constitutional violation for requiring a student to issue an apology as a condition of continuing on a sports team after the student circulated an insubordinate letter; "[i]t is well within the parameters of school officials' authority . . . to teach civility and sensitivity in the expression of opinions").

We conclude that the School District did not violate Corder's First Amendment free speech rights by compelling her to e-mail an apology prior to receipt of her high school diploma.

25

*First Amendment Freedom of Religion ("Free Exercise") Claim*

Corder claims that the School District "substantially burdened" her sincerely held religious beliefs in violation of the Free Exercise Clause of the First Amendment when it disciplined her for her valedictory speech. The First Amendment states that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I. "While the First Amendment provides absolute protection to religious thoughts and beliefs, the [F]ree [E]xercise [C]lause does not prohibit governments from validly regulating religious conduct." Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 649 (10th Cir. 2006) (citing Reynolds v. United States, 98 U.S. 145, 164 (1878)).

"Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." Id. (citing Employment Div. v. Smith, 494 U.S. 872, 879 (1990) (stating that the Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)" (internal quotation omitted))). "Thus, a law that is both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." Id.

"On the other hand, if a law that burdens a religious practice is not neutral

26

or generally applicable, it is subject to strict scrutiny, and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling governmental interest." Id. (citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993)). Therefore, our first step in analyzing Corder's free exercise claim is to determine "which level of scrutiny to apply." Id.; see e.g., Axson-Flynn, 356 F.3d at 1294 ("Depending on the nature of the challenged law or government action, a free exercise claim can prompt either strict scrutiny or rational basis review." (internal quotation omitted)).

"A law is neutral so long as its object is something other than the infringement or restriction of religious practices." Grace United Methodist Church, 451 F.3d at 649-50 (citing Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 533 (a "law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context")). It is clear from the facts Corder has alleged in her complaint that Corder was only required to follow the same religion-neutral policies as the other valedictorians. She was disciplined for her speech because she did not follow the religion-neutral policy of submitting her speech for prior review. Simply because Corder's valedictory speech happened to mention her religious views does not support the allegation that she was disciplined for her religious views. Corder's complaint does not permit this inference, when the facts of her complaint state she was the sole

27

valedictorian that did not follow the rules and therefore the sole valedictorian that was disciplined. "Neutral rules of general applicability ordinarily do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." Axson-Flynn, 356 F.3d at 1294.

We conclude that the School District did not violate Corder's First Amendment free exercise of religion rights by disciplining her for presenting a different valedictory speech than the one she gave to her principal for prior review.

*Fourteenth Amendment Equal Protection Claim*

Corder also maintains the district court erred in ruling that the School District did not violate the equal protection clause. The Fourteenth Amendment's Equal Protection Clause states that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. According to Corder, she was treated differently and more onerously than the other valedictorian speakers because the School District "allowed similarly situated speakers to give inspiring speeches without facing disciplinary action, but disciplined [Corder] because her inspiring speech contained religious elements." Aplt. Br. at 35.

Equal protection "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). The problem with Corder's claim lies in this fundamental

28

precursor: similarity. Simply because she alleges that all valedictory speakers gave "inspirational" speeches does not mean that all valedictory speakers were similarly situated. The crux of the dispute between Corder and the School District is that Corder gave a speech at graduation that was different from the speech she submitted for review to the principal prior to graduation. She cannot merely include the conclusory allegation that all valedictorians were "similarly situated," when the remainder of her recitation of the facts indicates otherwise. The district court correctly ruled for the School District on Corder's equal protection claim by concluding Corder was not similarly situated to the other valedictory speakers.

In any event, because Corder does not contend she is either a member of a suspect class or was denied a fundamental right, the School District's disciplinary response after her graduation speech need only be rationally related to a legitimate government purpose to pass muster under the equal protection clause. Save Palisade FruitLands v. Todd, 279 F.3d 1204, 1213 (10th Cir. 2002). As we have discussed throughout, the School District had reasonable, legitimate pedagogical purposes for disciplining Corder.

### Colorado State Law Claim

Finally, Corder claims the district court erred when it determined that her claim under Colo. Rev. Stat. § 22-1-120 failed because section 22-1-120 applied only to "publications." The statute states, in its entirety:

29

(1) The general assembly declares that students of the public schools shall have the right to exercise freedom of speech and of the press, and no expression contained in a student publication, whether or not such publication is school-sponsored, shall be subject to prior restraint except for the types of expression described in subsection (3) of this section.  This section shall not prevent the advisor from encouraging expression which is consistent with high standards of English and journalism.

(2) If a publication written substantially by students is made generally available throughout a public school, it shall be a public forum for students of such school.

(3) Nothing in this section shall be interpreted to authorize the publication or distribution in any media by students of the following:

> (a) Expression that is obscene;
>
> (b) Expression that is libelous, slanderous, or defamatory under state law;
>
> (c) Expression that is false as to any person who is not a public figure or involved in a matter of public concern; or
>
> (d) Expression that creates a clear and present danger of the commission of unlawful acts, the violation of lawful school regulations, or the material and substantial disruption of the orderly operation of the school or that violates the rights of others to privacy or that threatens violence to property or persons.

(4) The board of education of each school district shall adopt a written publications code, which shall be consistent with the terms of this section, and shall include reasonable provisions for the time, place, and manner of conducting free expression within the school district's jurisdiction.  The publications code shall be distributed,

posted, or otherwise made available to all students and teachers at the beginning of each school year.

(5)

(a) Student editors of school-sponsored student publications shall be responsible for determining the news, opinion, and advertising content of their publications subject to the limitations of this section. It shall be the responsibility of the publications advisor of school-sponsored student publications within each school to supervise the production of such publications and to teach and encourage free and responsible expression and professional standards for English and journalism.

(b) For the purposes of this section, "publications advisor" means a person whose duties include the supervision of school-sponsored student publications.

(6) If participation in a school-sponsored publication is part of a school class or activity for which grades or school credits are given, the provisions of this section shall not be interpreted to interfere with the authority of the publications advisor for such school-sponsored publication to establish or limit writing assignments for the students working with the publication and to otherwise direct and control the learning experience that the publication is intended to provide.

(7) No expression made by students in the exercise of freedom of speech or freedom of the press shall be deemed to be an expression of school policy, and no school district or employee, or parent, or legal guardian, or official of such school district shall be held liable in any civil or criminal action for any expression made or published by students.

(8) Nothing in this section shall be construed to limit the promulgation or enforcement of lawful school regulations

> designed to control gangs. For the purposes of this section, the definition of "gang" shall be the definition found in section 19-1-103(52), C.R.S.

Colo. Rev. Stat. § 22-1-120. The district court found that the statute's plain meaning prohibited only prior restraint of student expression that is contained within a publication.

Colorado follows the general rule of statutory construction that when construing a statute, we must begin with the statute's plain language, and if the "statute is clear and unambiguous on its face, then we need not look beyond the plain language and we must apply the statute as written." Vigil v. Franklin, 103 P.3d 322, 327 (Colo. 2004) (internal citations and quotations omitted). In addition, Colorado law dictates that "we afford the language of statutes their ordinary and common meaning and construe statutory provisions as a whole, giving effect to every word and term contained therein, whenever possible." Id. (internal quotations and alterations omitted).

Both parties argued in the district court and in their briefs to this court that section 22-1-120 is not ambiguous.[8] The district court so found and we agree that the statute is not ambiguous. We further agree with the district court's reading of

---

[8] At oral argument, Corder changed course and argued for the first time that Colo. Rev. Stat. § 22-1-120 is ambiguous. An argument made for the first time at oral argument, however, will not be considered. Fed. Ins. Co. v. Tri-State Ins. Co., 157 F.3d 800, 805 (10th Cir. 1998) ("Issues raised for the first time at oral argument are considered waived.").

the plain meaning of the statute. The actual prohibition from subsection 22-1-120(1) is that "no expression contained in a student publication, whether or not such publication is school-sponsored, shall be subject to prior restraint."

Although the statute begins with a general statement that students in public schools "shall have the right to exercise freedom of speech and of the press" it is clear from reading the entire statute that section 22-1-120 regulates only student "expression" that is contained within a written "publication." There are numerous provisions of section 22-1-120 pertaining to written speech and journalism to further emphasize this point: § 22-1-120(1) ("encouraging expression which is consistent with high standards of . . . journalism"); § 22-1-120(2) ("If a publication written substantially by students is made generally available throughout a public school, it shall be a public forum for students of such school."); § 22-1-120(4) ("The board of education of each school district shall adopt a written publications code . . . ."); § 22-1-120(5) ("Student editors of school-sponsored student publications shall be responsible for determining the news, opinion, and advertising content of their publications subject to the limitations of this section."); and § 22-1-120(6) ("If participation in a school-sponsored publication is part of a school class or activity . . . the provisions of this section shall not be interpreted to interfere with the authority of the publications advisor for such school-sponsored publication to establish or limit writing assignments for the students working with the publication . . . .").

33

Further, even if the statute were ambiguous, there is no legislative history or Colorado case law which would alter our plain-meaning analysis. It appears, however, that section 22-1-120 was passed by the Colorado legislature in the wake of Hazelwood and the concern regarding its impact on student newspapers. See, e.g., Richard J. Peltz, Censorship Tsunami Spares College Media: To Protect Free Expression on Public Campuses, Lessons from the "College Hazelwood" Case, 68 Tenn. L. Rev. 481, 501, n.161 (2001) (describing Colo. Rev. Stat. § 22-1-102 as an effort by Colorado to pass an "anti-Hazelwood" law to protect student publications). This "response to Hazelwood" is another indication that the Colorado legislature meant for this statute to be limited in applicability to written student publications.

We affirm the district court's grant of judgment on the pleadings to the School District on Corder's state-law claim, as Corder's claim does not fall within Colo. Rev. Stat. § 22-1-120.

### III

We AFFIRM the district court's grant of the School District's Fed. R. Civ. P. 12(c) motion for judgment on the pleadings.